PETER SCALISI, (SBN: 90131)
Attorney at Law
18685 Main Street, Suite 101
Huntington Beach, California 92648
Telephone:   949-274-1166
Facsimile:   714-969-9220
Email:   lawoffps@aol.com

Attorney for Mark Kirk

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK A. KIRK,<br><br>    Plaintiffs,<br><br>  v.<br><br>COUNTY OF SAN BERNARDINO;<br>MICHAEL A. RAMOS, in his<br>individual capacity, MELISSA<br>MANDEL, in her individual capacity;<br>R.LEWIS COPE, in his individual<br>capacity; HOLLIS "BUD" RANDLES,<br>in his individual capacity; ROBERT<br>SCHREIBER, in his individual<br>capacity, ADAM ALEMAN, individual<br>capacity, JOSIE GONZALES, in her<br>individual capacity, EDMUND G.<br>BROWN, JR., in his individual<br>capacity; GARY SCHONS, in his<br>individual capacity,<br><br>    Defendants. | Case No. 5:18-cv-01597<br><br>COMPLAINT FOR:<br><br>(1) MALICIOUS PROSECUTION 42<br>  U.S.C. 1983;<br>(2) RETALIATION 42 U.S.C. 1983;<br>(3) FABRICATION OF EVIDENCE<br>  42 U.S.C. 1983;<br>(4) MONELL CLAIM; 42 U.S.C.<br>  1983;<br>(5) SUPERVISORIAL LIABILITY<br>  42 U.S.C. 1983;<br>(6) CONSPIRACY 42 U.S.C. 1983;<br>(7) RETALIATION IN<br>  EMPLOYMENT STATE LAW<br><br>DEMAND FOR JURY TRIAL |

1.      Plaintiff, Mark A. Kirk, brings this action seeking compensatory and punitive damages against Defendants, COUNTY OF SAN BERNARDINO (County), MICHAEL A. RAMOS, MELISSA MANDEL, R. LEWIS COPE, HOLLIS "BUD" RANDLES, ROBERT SCHREIBER, ADAM ALEMAN, JOSIE GONZALES, EDMUND G. BROWN, JR., AND GARY SCHONS for violations of Mr. Kirk's civil and other rights under the United States Constitution and Under California law.

2.      Mr. Kirk's claims are based upon an illegal campaign of retaliation, intimidation, harassment, and malicious prosecution by the County and the State of California, via their employees.  Mr. Kirk was employed by the County as the Chief of Staff for Mr. Gary Ovitt, an elected member of the County Board of Supervisors. While Mr. Kirk was so employed, a Mr. Jeffrey S. Burum and Colonies Partners sued the County for the right to receive just compensation for the uncompensated "taking" of 72 acres of land by Defendant County and the San Bernardino County Floor Control District (District) for a regional flood control facility.  Mr. Burum and Colonies exercised their First Amendment free speech rights to petition the government and advocate for the settlement of the lawsuit.  Mr. Kirk, and Mr. Ovitt, were of the lawful opinion that the County should settle the lawsuit and Mr. Kirk and Mr. Ovitt reasonably believed that the County was exposed to an extraordinary financial liability if the County did not reach a settlement of the lawsuit.  As a result of the constitutionally protected efforts of Mr. Burum and Colonies, a settlement of the lawsuit in the amount of $102-million dollars was reached in November of 2006.

3.      Following the settlement, Colonies continued to exercise it's free speech rights, again under the leadership and guidance of Mr. Burum, by making political contributions to general purpose political action committees (PAC's) affiliated with pro-development politicians, including members of the San Bernardino County Board of Supervisors and others who had supported the settlement, including to various media outlets, the goal of these PAC contributions

1   was to support pro-development politicians and candidates for political office who

2   root out the intransigent and corrupt elements of the County that had plagued the

3   Colonies civil litigation.

4          4.     One of the political contributions made by Colonies was to the Alliance

5   For Ethical Government (AEG).  The AEG was a lawful PAC.  The contribution was

6   made in the month of May of 2007, approximately 7 months after the settlement had

7   been reached in the Colonies lawsuit.  Mr. Kirk was the Founder and the Executive

8   Director of the AEG and the PAC was formed to pursue ethical government in the

9   County and to make lawful political contributions to candidates who would serve the

10  citizens in an ethical and honorable manner.

11         5.     The AEG filed all of the legal and appropriate disclosure documents

12  with the Secretary of State for the State of California.

13         6.     As a result of the settlement in the Colonies lawsuit, and as a result of

14  the lawful contribution to the AEG, the Defendant's began a retaliatory campaign

15  developed and manifested in several ways.  One such way was an unfounded

16  criminal investigation of Mr. Kirk, Mr. Burum, Mr. Paul Biane, and Mr. James

17  Erwin, and Colonies. This retaliatory and unfounded criminal investigation

18  ultimately resulted in felony charges being brought against Mr. Kirk in the case of

19  *People of the State of California v. Paul Biane, et. al.,* case number: FSB-1102102.

20  Mr. Kirk was charged with multiple felonies, including Conspiracy, Bribery, Public

21  Officer Crime, Improperly Influencing A Legislative Action, and with Conflict of

22  Interest.  Mr. Kirk was arrested on these charges in the month of May of 2011 and

23  he was put into custody.

24         7.     Before Mr. Kirk was charged and arrested, he had changed his job with

25  the County.  In 2010, Mr. Kirk accepted the job of Director of Government

26  Relations in the County Executive Office.  Mr. Kirk was placed on administrative

27  leave without pay as a result of the filing of the charges against him, and as a result

28  of his arrest on the charges.  Mr. Kirk was not allowed to work in his office in the

County and he was not allowed to communicate with his staff and he was not allowed to pursue employment outside of the County.  As a result of these retaliatory actions against Mr. Kirk, he was forced to resign his position with the County.

8.   Mr. Kirk was put through 6-years of criminal litigation, and a 10-month jury trial in the San Bernardino County Courthouse.  Based upon the testimony and the exhibits and the evidence that the prosecution produced at the criminal trial of Mr. Kirk, it was readily apparent that the prosecution of Mr. Kirk was malicious and retaliatory and without any justification.

9.   Mr. Kirk did not need to call a single defense witness on his behalf when the prosecution had rested it's case.  After only several hours of deliberation, the jury returned a verdict of Not Guilty on the only 2 remaining charges against Mr. Kirk.   (The trial judge had dismissed the other charges against Mr. Kirk when the prosecution had rested.)  Mr. Kirk was completely vindicated of all charges against him.

10.   This thorough repudiation of the prosecution's case, and the lengths to which the  prosecutors, investigators, and certain County-affiliated witnesses and other witnesses went to  manufacture a case against Mr. Kirk is evidence of the retaliatory and unjustified motives that drove the criminal investigation and the criminal prosecution from the beginning.  Simply put, there was never any evidence of criminal conduct involving the contribution to the AEG.  Mr. Kirk was maliciously and unfairly investigated, charged, and prosecuted on the charges in a criminal court for exercising his constitutional rights to engage in lawful political speech.

11.   The wanton disregard and malicious conduct of the Defendant's violates Mr. Kirk's constitutional rights under 42 U.S.C.1983.  As a direct and proximate result of the Defendant's actions, Mr. Kirk has suffered and will continue to suffer damages.  Mr. Kirk is entitled to compensatory  damages, punitive damages, attorney's fees and costs, pre-judgment interest, and all other relief as

1  provided by law.

2  **JURISDICTION AND VENUE**

3      12.    This case arises under 42 U.S.C. 1983 and California law. This Court

4  has jurisdiction over this action pursuant to 28 U.S.C. 1331, 1343, and 1367(a).

5      13.    Pursuant to California Government Code section 810 et.seq., Mr. Kirk

6  filed his state  law claims with Defendant County on the date of December 18, 2017.

7  The Defendant County rejected Mr. Kirk's state law claims in a letter of rejection

8  dated January 31, 2018.  Mr. Kirk is now filing these claims with this Court pursuant

9  to California Government Code section 945.6.

10      14.    Venue is proper in the Central District of California under 28 U.S.C.

11  1391 (b) (1) (2), and because the majority of the Defendants reside in this District

12  and substantial acts and omissions giving rise to Mr. Kirk's claims occurred in this

13  District.

14  **THE PARTIES**

15      15.    Plaintiff Mark A. Kirk is an individual who resides in the City of

16  Hesperia, in the County of San Bernardino, in the State of California.

17      16.    Defendant County of San Bernardino (County) is a municipal

18  corporation organized and existing under the laws of the State of California.

19  Defendant County was at all relevant times mentioned herein responsible for its own

20  actions and/or omissions as well as the actions and/or  omissions and the policies,

21  procedures, customs, and practices of the San Bernardino County District Attorney's

22  Office.

23      17.    At all relevant times, Defendant Michael A. Ramos was the District

24  Attorney of the County of San Bernardino.  In that capacity, he is the official

25  responsible for setting and enforcing the policies, customs, and the practices of the

26  District Attorney's Office.  Defendant Ramos at all relevant times directed,

27  supervised, authorized, and/or ratified the actions of the office's employees, agents,

28  and officials as alleged herein.

18.    At all relevant times, Defendant R. Lewis Cope was a Deputy District Attorney for the County of San Bernardino in the District Attorney's "Public Integrity Unit" and was a supervisor in that unit. Defendant Cope is employed by and is an agent of Defendant County and the District Attorney's Office at all relevant times herein.  Defendant Cope was one of the lead prosecutors from the District Attorney's Office assigned to prosecute Mr. Kirk, and as such he directed and participated in the retaliatory criminal investigation of Mr. Kirk, including directing, supervising, authorizing, and/or ratifying the actions of the Public Integrity Unit's other employees, agents, and officials working on the investigation and the criminal action against Mr. Kirk.

19.    At all relevant times, Defendant Melissa Mandel was a Supervising Deputy Attorney General for the State of California.  Defendant Mandel is employed by and is an agent of the State of California and the Attorney General's Office. Defendant Mandel was one of the lead prosecutors  assigned to prosecute Mr. Kirk, and as such, she directed and participated in the retaliatory criminal investigation and prosecution of Mr. Kirk, including directing, supervising, authorizing, and/or ratifying the actions of the Attorney General's Office's other employees, agents, and officials, as well as the District Attorney's investigators, who were working on the criminal investigation and the  criminal action of Mr. Kirk.

20.    At all relevant times, Defendant Hollis "Bud" Randles was an investigator in the San Bernardino County District Attorney's Office.  Defendant Randles was a lead District Attorney investigator in the retaliatory criminal investigation and criminal prosecution of Mr. Kirk.

21.    At all relevant times, Defendant Robert Schreiber was in investigator in the San Bernardino County District Attorney's Office.  Defendant Schreiber was a lead District Attorney investigator in the criminal investigation and criminal prosecution of Mr. Kirk.

22.    At all relevant times, Adam Aleman was a Field Representative and

assistant to then- Supervisor Bill Postmus.  Then, until July of 2008, Defendant Aleman was Assistant Assessor for the County of San Bernardino.  Thereafter Defendant Aleman was a cooperating witness who initiated and participated in the retaliatory criminal investigation and criminal prosecution of Colonies and Mr. Burum, which ultimately led to the retaliatory criminal investigation and criminal prosecution of Mr. Kirk.

23.     At all relevant times, Defendant Edmund G. Brown, Jr., was the Attorney General for the State of California.  Defendant Brown at all times directed, supervised, authorized, and/or ratified the actions of his office's employees, agents, and officials as alleged herein.

24.     At all relevant times until October of 2011, Defendant Gary Schons was a Deputy Attorney General for the State of California.  He was employed by and was an agent of the State of California and the Attorney General's Office.  Defendant Schons was one of the prosecutors assigned to prosecute Mr. Kirk, and as such, he directed and participated in the retaliatory criminal investigation and criminal prosecution Mr. Kirk, including directing, supervising, authorizing, and/or ratifying the actions of the Attorney General's Office's other employees, agents, and officials as well as the District Attorney's investigators working on the criminal investigation and criminal prosecution of Mr. Kirk.

25.     At all relevant times, Defendant Josie Gonzales was a member of the Board of Supervisors for the County of San Bernardino and she represented the Fifth District in the County of San Bernardino.  Defendant Gonzales participated in the retaliatory criminal investigation and the criminal prosecution of Mr. Kirk.

26.     In taking the actions alleged herein, the Defendants acted under color of law, and the Defendants conspired with each other and others to illegally retaliate against, intimidate, and harass and maliciously prosecute for alleged felony crimes Mr. Kirk for his lawful and rightful exercise of his free speech rights and his rights to freedom of association in the United States Constitution for his involvement in the

7

lawful and proper AEG, and for his involvement in lawful and proper political

activities in the pursuit of honest and ethical government in the County of San

Bernardino.

## RELEVANT FACTUAL ALLEGATIONS

27.   A brief statement of the facts of the civil litigation involving Colonies,

Mr. Burum, and the County are helpful to understand the claims in this Complaint.

28.   In 1997, Colonies purchased 434 acres of land in Upland, California for

development.  The County and other entities built the 210 Freeway extension

through Colonies' property, and the County needed a large area in which to contain

the massive water runoff caused by that project and the related 20th Street Storm

Drain.  The County and the District set out to force Colonies to build the flood

control facility itself, on Colonies' own land, and at the expense of Colonies, rather

than exercising the County's power of eminent domain over Colonies' land.

29.   The existing flood control facilities were utterly inadequate to contain

up to 80- million gallons of water per hour that could be flooding onto the property

through the 20th Street Storm Drain.  Colonies offered to give the County and the

District the necessary acreage if the County and the District would pay for the

construction of a basin that would control the new storm waters coming from the

210 Freeway project and the 20th Street Storm Drain.  The County and the District

refused.

30.   The position of the County and the District was that limited easements

from the 1930's allowed them to redirect the massive amount of flood waters created

by the construction of the freeway project onto the land of Colonies, and that

Colonies was obligated to pay for the required flood control facilities.

31.   Colonies filed a Quite Title action in March of 2002 to vindicate its

lawful property rights.  The Honorable Peter Norell heard the trial in the matter in

2003 in the San Bernardino Superior Court.  Mr. Burum testified for Colonies during

that trial. The trial went against the County and the District.  Judge Norell ruled that

the County and the District did not have the right to dump the flood water onto the land of Colonies without paying just compensation.  The County and the District appealed the decision of Judge Norell, and 3 years later, a second trial was held before the Honorable Christopher Warner in the San Bernardino Superior Court.

32.     On July 31, 2006, Judge Warner issued his statement of intended decision after 6 weeks of trial.  Judge Warner found that: 1) The County and the District's easements did not justify the necessary flood control facilities, and that the County and the District did not have the right to dump any water onto the land of Colonies; 2)  That the County and the District had engaged in "deceit" and that they had played "hide the ball" and that they did try to "coerce" Colonies into giving up it's rights with regard to it's land; 3) That Colonies had taken "every reasonable action to protect the public" even in the face of the County and the District's "deceit and misinformation"; 4)  That the County and the District had essentially held Colonies development "hostage" in order to get free flood control  construction and had  "unreasonably and unjustifiably interfered with Colonies business"; and 5) That the County and the District had "turned on" the 20th Street Storm Drain in 2002 "without providing  for any viable flood-control facilities on [Colonies] property and without ensuring public safety from the flooding hazard."

33.     Mr. Burum did testify at this second trial before Judge Warner.  Judge Warner found that Mr. Burum was "a very credible witness" who had "answered questions directly, succinctly, and without hesitation and equivocation." Unfortunately for the County and the District, Judge Warner criticized the credibility and the truthfulness of several witnesses who had testified at the trial for them, most notably, Mr. Ken Miller and Mr. Patrick Mead who are both Directors for the District.  Essentially, Judge Warner adopted the credible testimony of Mr. Burum over the testimony of Mr. Miller and Mr. Mead, which, understandably, was a sharp blow to the County and to the District.

34.     The statement of intended decision by Judge Warner was a critical

moment in the legal dispute between Colonies, Mr. Burum, and the County and the District.  Indeed, Mr. Mitchell Norton, a Deputy County Counsel for the County of San Bernardino, told investigators that Judge Warner's intended decision was "Armageddon" for the County and for the District. According to Mr. Norton, the County and the District would be facing around $300-million dollars in damages in an inverse condemnation action that had been stayed pending the resolution of the quiet title action *IF* the decision of Judge Warner became final.  Judge Warner had also found *bad faith* by the County and the District, and that finding would have threatened the attempts of the County and the District to get indemnification from other government agencies who were involved in the expansion of the 210 Freeway.

35.    Mr. Burum commented publicly on the County's and the District's reluctance to settle the legal dispute despite the "Armageddon" decision by Judge Warner.  Mr. Burum openly and publicly advocated for a settlement of the dispute, and he offered sharp criticism of the County's Board of Supervisors and staff, resulting in some negative press articles and public opinion regarding the County's and the District's incompetence and misconduct that could potentially expose the taxpayers of the County of San Bernardino to such a large financial risk.

36.    Mr. Burum exercised his United States Constitutional rights and he actively petitioned members of the Board of Supervisors for the County of San Bernardino and other County officials to settle the legal dispute in a reasonable and fair manner.

37.    During the litigation in the legal dispute, Mr. Burum had exercised his United States Constitutional rights by actively supporting and donating to candidates for the Board of Supervisors for the County of San Bernardino.  Colonies had likewise actively supported and donated to candidates for the Board of Supervisors for the County.  The candidates, Mr. Paul Biane, and Mr. Gary Ovitt, were pro-development candidates, and each had won their respective elections and had taken their seats on the Board of Supervisors for the County.

38.     The Board of Supervisors for the County settled the Colonies lawsuit for the sum of $102-million dollars on the date of November 28, 2006 thereby ending the contentious and public legal dispute.  The vote was 3-2 in favor of the settlement.  Supervisors Paul Biane, Gary Ovitt, and Bill Postmus voted in favor of settling the lawsuit; Supervisors Josie Gonzales and Dennis Hansberger voted against settling the lawsuit. (Supervisor Josie Gonzales had consistently been in favor of settling the lawsuit, however she changed her vote and voted against settling the lawsuit.)

39.     Months *after* the 3-2 vote of the Board of Supervisors for the County to settle the lawsuit, Colonies--under the leadership of Mr. Burum--exercised its United States Constitutional rights of free speech and petition and made political contributions to PAC's associated with members of the Board of Supervisors and to others who had supported the settlement of the lawsuit and who would be in favor of pro-development policies and projects.

40.     The AEG was one such PAC that received one of these political contributions in May of 2007, 7-months after the vote to settle the lawsuit by the Board of Supervisors for the County.  Mr. Mark Kirk was the Executive Director and the Founder of the AEG.

**THE CRIMINAL INVESTIGATION AND CRIMINAL JURY TRIAL IN 2017**

41.     The County had suffered a stinging defeat by Judge Warner, and had suffered a lot of negative publicity at the hands of Colonies and Mr. Burum.  2 pro-development members of the Board of Supervisors were elected with the support and the political contributions of Colonies and Mr. Burum. And the lawful settlement obligated the County and the District to pay $102-million dollars to Colonies.  The Defendants were embarrassed and angry at the turn of events

42.     Despite the lawful vote by the Board of Supervisors for the County to settle the lawsuit to avoid "Armageddon," the County, and the District Attorney's Office for the County of San Bernardino, and the Attorney General's Office for the

State of California, and it's employees and it's agents, and it's investigators, began a retaliatory and malicious criminal investigation of Colonies and Mr. Burum.  This criminal investigation ultimately led to the lawful political contribution made by Colonies to the AEG, and to Plaintiff Mr. Kirk who was charged in an Indictment with multiple felony charges.

43.     In 2010, Defendant Ramos and Defendant Brown held a joint press conference to announce the prosecution of what they called the largest public corruption scandal in the history of California.  Defendant Brown claimed that it was the "most appalling corruption case in decades" and a "shocking example of how money can corrupt the government process".

44.     Defendant Ramos stated that two Colonies partners had been named as un-indicted co-conspirators at the time, and he warned that there was an "ongoing investigation."  Defendant Ramos said that a "well-orchestrated political and personal attack on this District Attorney, attempting to intimidate me in obstructing justice and finishing this job," and he noted that Colonies and Mr. Burum were threats to his power, and declaring that he was going to "finish the job" by aggressively investigating Colonies and Mr. Burum.  Defendant Ramos assured the public that Defendant Brown was his "crime-fighting partner," and that both were responsible for the investigation.  Defendant Ramos said that the Attorney General's Office "went through all of our evidence, and now have worked with us every day on this."  Defendant Ramos named several of the Defendants, such as Gary Schons and Melissa Mandel that they were "working together every day" on the investigation.

45.     Defendant Ramos said that Colonies had obtained the compensation for its property in "these tough economic times," and explained that his goal was to "get that money back to the citizens."

46.     Defendant Brown stated that he found it significant that there was "$102-million being voted on," and explaining that the settlement would be "void"

and that the $102-million would be paid back to the County by Colonies. Defendant Brown claimed that there was "no basis" for the $102- million dollar settlement despite the fact that the Defendant County's own lawyer, Mr. Mitchell Norton, had stated that Judge Warner's intended decision was "Armageddon" for the County.

47.     Defendant Ramos held another press conference in 2011 after Plaintiff Mr. Kirk, Mr. Burum, Mr. Biane, and Mr. Erwin were indicted and arrested and put into custody.  During this press conference Defendant Ramos said that Defendant Mandel was calling the prosecution team "Team Justice." Defendant Ramos named Defendant Mandel, Defendant Cope, Defendant Randles, Defendant Schreiber, Defendant Brown, and others, as members of "Team Justice."  Defendant Ramos brought up the $102-million dollar settlement, during the press conference, and said that "Team Justice" was going to seek an order requiring Colonies and Mr. Burum to return the money that had been approved by the lawful vote of the Board of Supervisors for the County.  Defendant Ramos said during the press conference that the District Attorney's Office and the County Counsel's Office for the County of San Bernardino were "partners" in their efforts to recover the $102-million dollars thereby demonstrating that the Defendant Ramos and the Defendant County were complicit in the malicious and retaliatory scheme to pursue a criminal investigation and to seek and obtain an Indictment from the Grand Jury against Plaintiff Mark Kirk.

48.     Such public inflammatory, reckless, and prejudicial statements by the Defendant Ramos and Defendant Brown and Defendant Mandel evidenced a malicious and retaliatory motive and conspiracy by him and the Defendants to pursue a criminal investigation and to seek an Indictment  before the Grand Jury against Plaintiff Mr. Kirk.

49.     The pretext for the retaliatory and malicious criminal investigation and the flawed presentation of the evidence at the Grand Jury and the Indictment with

multiple serious felony charges against Plaintiff Mr. Kirk was the contribution to the AEG. The heart of the retaliatory criminal investigation was that the contribution to the AEG in May of 2007 was a "secret" payoff for the votes of the members of the Board of Supervisors for the County to approve the $102-million dollar settlement. In short, the contribution to the AEG was an alleged bribe. (And that the contributions to the other PAC's were also alleged bribes.)

50. The Defendants knew, and chose to ignore, the fact that the contribution to the AEG was fully and publicly disclosed on all of the appropriate disclosure forms commonly used by PAC's. The AEG filed all of the appropriate disclosure forms with the Secretary of State for the State of California to publicly document all of its financial activities. The AEG had an experienced person, Betty Presley, who made sure that all of the financial activities of the AEG were proper, legal, and in full compliance with the laws for the creation, and the organization, and the operation of a PAC in the State of California.

51. The Defendants knew, and chose to ignore, the fact that the AEG was set-up and organized for a legal and legitimate purpose, to wit, to promote and support better and ethical government in the County of San Bernardino, and to promote and support better and ethical candidates to political office for the betterment of the residents of the County of San Bernardino.

54. The Defendants knew that the political contribution to fund the AEG came from Colonies under the leadership of Mr. Burum in the exercise of their lawful free speech rights under the United States Constitution. The Defendants knew that Plaintiff Mr. Kirk was the Executive Director and the Founder of the AEG who decided to serve in that role in the lawful exercise of his free speech rights and in the lawful exercise of his rights of freedom of association under the United States Constitution.

55. The Defendants unfairly and maliciously targeted Plaintiff Mr. Kirk because of the fact that Colonies and Mr. Burum had made the lawful political

contribution to the AEG.

56.     The Defendants Ramos, Mandel, Randles, Schreiber, Schons and Cope conducted a criminal investigation into Plaintiff Mr. Kirk and the AEG to target Mr. Kirk and the AEG simply because the political contribution to fund the AEG came from Colonies and Mr. Burum.

57.     The Defendants Ramos, Mandel, Randles, Schreiber, Schons, and Cope, during the course of the criminal investigation chose to ignore the vast amount of exculpatory evidence and facts that showed that Plaintiff Mr. Kirk had done nothing wrong, and in fact, had simply exercised his rights of free speech and his rights of freedom of association under the United States Constitution to become the Executive Director and the Founder of the AEG.

58.     The Defendants Mandel and Cope appeared for "Team Justice" on behalf of the prosecution and they presented witnesses and documents to the criminal Grand Jury in April of 2011 in their pursuit of an Indictment against Plaintiff Mr. Kirk for multiple serious felony charges against him.

59.     The Defendants Mandel and Cope, on behalf of "Team Justice" chose to ignore and chose to not present to the members of the criminal Grand Jury exculpatory evidence that would have shown that Plaintiff Mr. Kirk was exercising his lawful rights of freedom of speech and his rights of freedom of association under the United States Constitution by serving as the Executive Director and the Founder of the AEG.

60.     The theory of the Defendant's to maliciously implicate Plaintiff Mr. Kirk in the course of the criminal investigation and in the pursuit of the criminal charges against him was that Plaintiff Mr. Kirk "pressured" his then-boss, former Supervisor Gary Ovitt, to vote for the $102-million dollar settlement.  And that essentially Supervisor Ovitt voted for the $102-million dollar settlement due to such pressure from Plaintiff Mr. Kirk.  The Defendant's alleged that the "reward" to Plaintiff Mr. Kirk for delivering the vote of Supervisor Ovitt in favor of the

settlement was the Colonies' political contribution to the AEG approximately 7-months after the vote to approve the settlement in November of 2006.  The bottom line was that the political contribution from Colonies to the AEG was a "payoff" or a "bribe" for the vote of Supervisor Ovitt to approve the settlement.

61.    The Defendant's Ramos, Mandel, Cope, Randles, Schreiber, and Schons all chose to ignore the exculpatory facts that Gary Ovitt had always been in favor of settling the Colonies lawsuit even before he was elected to the Board of Supervisors and before he had even met Plaintiff Mr. Kirk.  Mr. Ovitt's position in favor settling the lawsuit was widely and publicly known before he was elected to the Board of Supervisors.

62.    During the criminal trial of Plaintiff Mr. Kirk in 2017, Defendant's Mandel and Cope called Gary Ovitt as a prosecution witness.  Mr. Ovitt testified that he voted for the $102-million dollar settlement on his own believing that the settlement was in the best interests of the County and of the residents whom he represented while a member of the Board of Supervisors.  Mr. Ovitt testified that Plaintiff Mr. Kirk did not pressure him in any way to vote for the settlement, and that Plaintiff Mr. Kirk was a honest and trustworthy person.  These exculpatory facts were never mentioned by the Defendants during any of the press conferences that were held about the case by "Team Justice."

63.    During the criminal trial of Plaintiff Mr. Kirk in 2017, Defendant's Mandel and Cope called Lynda Farrady as a prosecution witness.  Ms. Farrady was called as an expert witness on the subjects of the legal requirements and the laws relating to PAC's, and the legal regulations relating to the financial forms that must be filed with the Secretary of State for the State of California per the California Fair Political Practices Commission (FPPC.)   Ms. Farrady testified that the AEG did in fact file the necessary and required financial forms with the FPPC, and that the forms were openly and publicly available for anyone to see.

64.    Ms. Farrady testified during the trial that she could recommend to the

District Attorney's Office on behalf of the FPPC that a misdemeanor criminal charge be filed against any PAC that was believed to have violated any of the laws and regulations regarding the financial forms and the financial regulations of the FPPC. Ms. Farrady testified that she did not see any violation of the laws and regulations of the FPPC by AEG, and that she did not ever recommend that the D.A.'s office file a criminal charge against AEG; that essentially, AEG followed the laws "by the book."

65.     During the criminal trial of Plaintiff Mr. Kirk in 2017, Defendant's Mandel and Cope called Defendant Josie Gonazles as a prosecution witness. Defendant Gonzales was at all relevant times, and currently still is, a member of the Board of Supervisors for the County of San Bernardino. Defendant Gonzales had always been in favor of settling the Colonies lawsuit, and she had agreed to the $102-million dollar settlement during the mediation proceedings before the final settlement was reached in November of 2006.  Defendant Gonzales switched her vote and voted against the $102-million dollar settlement in November of 2006. Defendant Gonzales testified during the criminal trial to Plaintiff Mr. Kirk's "aggressive" and "pushy" behavior while he was employed by the County.

66.     Defendant Gonzales testified at the criminal trial that Mr. Burum had pressured her to vote for the settlement while both she and Mr. Burum were in the Country of China at a particular point in time.  Unfortunately for the Defendants, and Defendant Gonzales, Mr. Burum was never in the County of China at the time that Defendant Gonzales testified under oath that he was there.  The Defendants, in their zeal to maliciously prosecute Mr. Burum, and to present false testimony against him, and against Plaintiff.  Mr. Kirk, ignored plainly exculpatory evidence, to wit, that Mr. Burum's United States Passport  showed that he was never in the Country of China, and that Mr. Burum's American Express bills which the Defendant's had subpoened showed that Mr.Burum was in the City of Palm Springs, California, at the exact same time that Defendant Gonzales testified under oath that he was in the

1    Country of China.

2        67.    During the criminal trial of Plaintiff Mr. Kirk in 2017, the Defendants

3    Mandel and Cope called Defendant Adam Aleman as a prosecution witness.

4    Defendant Aleman had reached a deal with the Defendants Ramos, Mandel, Cope,

5    Schons, Randles, and Schreiber, to testify against Plaintiff Mr. Kirk, as well as Mr.

6    Burum, Mr. Biane, and Mr. Erwin in the trial.  Defendant plead guilty to perjury and

7    several other felonies in exchange for his testimony at the trial.  Defendants Mandel

8    and Cope called Defendant Aleman to testify at the criminal Grand Jury in April of

9    2011, and Defendant Aleman testified to the members of the Grand Jury that

10   Plaintiff Mr. Kirk told him that "Jeff [Mr. Burum] is giving me one-hundred

11   thousand dollars for Gary's [Mr. Ovitt] vote."  Defendant Aleman testified to the

12   members of the Grand Jury that it was his belief that Plaintiff Mr. Kirk was setting

13   up the AEG to get the one-hundred dollar contribution for the vote of Mr.

14   Ovitt.  This false testimony presented by Defendants Mandel and Cope led to the

15   Indictment against Plaintiff Mr. Kirk and his subsequent criminal trial in 2017.  It

16   should be noted that Defendant did not testify to the same things as he did to the

17   Grand Jury.

18       68.    Defendant Aleman wore a wire and acted in an undercover capacity for

19   the Defendants Ramos, Mandel, Cope, Schons, Randles, and Schreiber during the

20   criminal investigation in the case. On the date of January 20, 2009, Defendant

21   Aleman recorded a conversation with Bill Postmus in which the matter of the AEG

22   came up, and the matter of Plaintiff Mr. Kirk being paid a salary of $20,000 from the

23   AEG for his work as a political consultant.  Plaintiff Mr. Kirk had experience and

24   expertise in the field of political consulting.  During this recorded undercover

25   conversation, Defendant Aleman says to Bill Postmus that the salary of $20,000 to

26   Plaintiff Mr. Kirk "is not illegal."

27       69.    Defendants Mandel and Cope did not move the trial court that was

28   presiding over the criminal trial in 2017 of Plaintiff Mr. Kirk, to dismiss the charges

against him given the exculpatory *evidence that the Defendants themselves elicited during the case-in-chief.  The fact that the Defendants* pursued the criminal investigation, and pursued the criminal charges against Plaintiff Mr. Kirk in the face of such substantial exculpatory evidence that completely undermined the entire prosecution theory  against Plaintiff Mr. Kirk goes to show the malicious and retaliatory motives on the part of the Defendants.

70.  Two people who were *similiarly situated* yet one was investigated and charged with multiple serious felonies, and made to endure the stress and the strain of 6 years of criminal litigation, and made to endure a 10-month criminal jury trial as a criminal defendant, this person being the Plaintiff Mr. Kirk, and the other person being Mr. Matt Brown, who was not made to endure a criminal investigation and the stress and the strain of a criminal jury trial; this disparate treatment goes to show the malicious and the retaliatory motives of the Defendants as to Plaintiff Mr. Kirk for the lawful exercise of his right to free speech and his rights to freedom of association under the United States Constitution.

71.  Mr. Matt Brown was the Chief of Staff to Mr. Paul Biane, former Supervisor on the Board of Supervisors for the County of San Bernardino (and a defendant in the Indictment and criminal jury trial referred to herein.)  Plaintiff Mr. Kirk was the Chief of Staff to Gary Ovitt, former Supervisor on the Board of Supervisors for the County of San Bernardino.  Mr. Brown formed and ran a PAC called the San Bernardino Young Republicans (SBYR).  Plaintiff Mr. Kirk was the Executive Director and Founder of a PAC, called the AEG.  Colonies, under the leadership of Dan Richards, a partner in Colonies with Mr. Burum, made a lawful political contribution to the SBYR in the amount of one-hundred thousand dollars in the month of May of 2007.  Colonies, under the leadership of Mr. Burum, made a lawful political contribution to the AEG in the amount of one-hundred thousand dollars in the month of May of 2007.   The SBYR was designed to help Mr. Biane politically, and to help in political campaigns and other political endeavors.  The

AEG was designed to help in political campaigns, and to support and elect ethical and honest candidates to political office, and to support ethical and honest government.  The SBYR complied with the applicable laws and regulations governing the financial affairs of a PAC, and all of the required documents and financial disclosure forms were property and publicly filed with the Secretary of State for the State of California. The AEG complied with the applicable laws and regulations governing the financial affairs of a PAC, and all of the required documents and financial disclosure forms were properly and publicly filed with the Secretary of State for the State of California.

72.    Defendant Randles interviewed Mr. Brown and Mr. Brown agreed to go undercover and wear a wire and record conversations with potential targets in the criminal investigation as well as witnesses in the criminal investigation.  Defendant Randles interviewed Plaintiff Mr. Kirk and Plaintiff Mr. Kirk did *not* agree to go undercover and to wear a wire to record conversations with potential targets in the criminal investigation as well as witnesses in the criminal investigation.

73.    Mr. Brown found himself not charged with any crimes.  Plaintiff Mr. Kirk found himself charged with multiple and serious felony crimes.  This obvious disparity and patent unfairness is evidence of the malicious and the retaliatory motives of the Defendants to punish Plaintiff Mr. Kirk for the lawful exercise of his rights to free speech and his rights of freedom of association under the United States Constitution.

74.    Defendants Ramos, Mandel, Cope, and Schons, are members of the California State Bar.  As such, the Defendants are governed by the California Rules of Professional Conduct (RPC.) One such applicable rule is Rule 5-110 of the RPC. Rule 5-110 says that one of the Special Responsibilities of a Prosecutor is to not institute or continue to prosecute a charge that the prosecutor knows is not supported by probable cause.  Based upon the substantial amount of exculpatory evidence that the Defendants themselves presented at the criminal trial, and that was readily

available to them yet not presented to the members of the criminal Grand Jury in April of 2011, the reasonable conclusion is that the Defendants were obligated to dismiss the charges against Plaintiff Mr. Kirk during the criminal trial in 2017.  Not so dismissing the charges against Plaintiff Mr. Kirk either before or during the criminal trial does show a malicious and retaliatory motive by the Defendants to punish Plaintiff Mr. Kirk for the lawful exercise of his right to free speech and his rights to freedom of association under the United States Constitution.

## FIRST CLAIM

## MALICIOUS PROSECUTION---42 U.S.C. 1983

75.     Plaintiff Mr. Kirk re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 74, inclusive, in this Complaint as though fully set forth herein.

76.     As alleged in this Complaint, the criminal investigation and the criminal prosecution of Plaintiff Mr. Kirk was undertaken to retaliate against Plaintiff Mr. Kirk for the lawful exercise of his right to free speech and his rights of freedom of association under the United States Constitution. The Defendants Ramos, Mandel, Cope, Randles, Schreiber, and Schons, all members of "Team Justice" set about to maliciously punish Plaintiff Mr. Kirk due to the fact that his PAC, the AEG, had received the political contribution from Colonies and Mr. Burum in May of 2007, and due to the fact that Plaintiff Mr. Kirk would not agree to work undercover as desired by the Defendants.

77.     Defendants Randles and Schreiber manipulated the criminal investigation of Plaintiff Mr. Kirk in the manner in which they handled a prosecution witness, Mr. Bill Postmus.  Mr. Postmus was suffering from an addiction to methamphetamine during the time that the investigation was ongoing, and during the time that the Defendants Randles and Schreiber were conducting multiple interviews of Mr. Postmus.  Defendants Randles and Schreiber deliberately did not drug-test Mr.Postmus during the ongoing criminal investigation and during the times that they

conducted their interviews of Mr. Postmus.  Defendants Randles and Schrieber used techniques during their many interviews of Mr. Postmus that were designed to plant false memories of events and statements that never happened.

78.     Defendant Randles and Schreiber were the lead investigators for the Public Integrity Unit in the District Attorney's Office working under the supervision of Defendants Ramos, Cope, and Mandel during the criminal investigation and during the criminal jury trial in this matter.  Defendant Randles testified during the jury trial in 2017 that he believed that the settlement in the Colonies lawsuit was outrageous and egregious based solely upon the fact that the amount of the settlement was $102-million dollars.  Defendant Randles' testimony gave the distinct impression that criminal activity must have been involved in the settlement due to the dollar amount of the settlement.  This testimony prompted the trial judge in the criminal jury trial in 2017 to ask Defendant Randles while he was on the witness stand with the jury present *when* Defendant Randles and the Public Integrity Unit began to suspect that something was amiss due to the dollar amount of the settlement.  Defendant Randles admitted to the trial judge that his suspicions began in December of 2006, a few weeks after the $102-million dollar settlement was reached in November of 2006.

79.     Defendant Randles testified at the criminal jury trial in 2017 that "I don't know a lot about the facts" of the Colonies civil litigation, and that he had never read the opinions of the judge's who were involved in hearing the civil litigation.  Defendant Randles had never read nor understood that the appraisal of the Colonies' land that had been taken by the Defendant County was over $100-million dollars.

80.     The actions and the conduct of Defendants Randles and Schreiber during the criminal investigation, and the actions and conduct of Defendants Ramos, Mandel, and Cope, and "Team Justice" during the criminal Grand Jury in April of 2011, and during the course of the criminal litigation and the 10-month criminal jury trial in 2017 caused Plaintiff Mr. Kirk to be maliciously prosecuted without probable

cause and for the purpose to retaliate and punish Plaintiff Mr. Kirk for the lawful exercise of his right to free speech and his rights of freedom of association under the United States Constitution.

81.     The harm to Plaintiff Mr. Kirk from the illegal actions of the Defendants has resulted in the loss of income, the loss of retirement benefits, the loss of employment with the County of San Bernardino, the loss of business opportunities, the loss of reputation, the cost of hiring lawyers, and such other compensatory damages in an amount to be proven at trial.

82.     The actions and the conduct of the Defendants Ramos, Mandel, Cope, Randles, and Schreiber was willful, wanton, malicious, retaliatory, and with reckless disregard for the Constitutional rights of Plaintiff Mr. Kirk and does therefore justify the imposition of exemplary and punitive damages as to each of them.

## SECOND CLAIM
## RETALIATION---42 U.S.C. 1983

83.     Plaintiff Mr. Kirk re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 82, inclusive, in this Complaint as though fully set forth herein.

84.     Defendants Ramos, Mandel, Cope, Randles, Schreiber, Schons, and Brown, are, or were, all *state actors* or *acting under the color of state law* at all relevant times herein, and all of them had a duty to permit Plaintiff Mr. Kirk to the free exercise of his right to free speech and his rights of freedom of association and to the free exercise of his other rights under the United States Constitution.

85.     When the Plaintiff, Mr. Kirk, exercised his rights under the United States Constitution as alleged herein, the Defendants Ramos, Mandel, Cope, Randles, Schreiber, Schons, and Brown *retaliated* against him by participating in actions and conduct to interfere with, and to deprive the Plaintiff, Mr. Kirk in the free exercise of his rights The Defendant's retaliatory actions and conduct include, but are not limited to, the following:

A.     Initiating a baseless and illegitimate criminal investigation of the AEG, and of Plaintiff, Mr. Kirk;

B.     Eliciting false statements during the criminal investigation phase, and false and perjurious testimony during the criminal Grand Jury in April of 2011, and during the criminal jury trial in 2017, from Defendants Aleman, Gonzales, and others, to implicate Plaintiff, Mr. Kirk, in non-existent criminal activity with regard to the AEG, and the lawful political contribution to the AEG from Colonies;

C.     Threatening and coercing other witnesses, such as Mr. Matt Brown, into the giving or the making of false statements during the criminal investigation and providing perjurious testimony.

D.     Fabricating and falsifying evidence during the criminal investigation;

E.     The deliberate hiding of exculpatory evidence from two grand juries.

86.     The lawful and free exercise by the Plaintiff Mr. Kirk of his rights under the United States Constitution was the reason for the retaliatory actions and conduct of the Defendants Ramos, Mandel, Cope, Randles, Schreiber, Schons, and Brown.

87.     The harm to the Plaintiff Mr. Kirk from the retaliatory and the illegal actions and conduct by the Defendants Ramos, Mandel, Cope, Randles, Schreiber, Schons, and Brown has resulted in the loss of income, the loss of retirement benefits, the loss of employment with the County of San Bernardino, the loss of business opportunities, the loss of reputation, the cost of hiring lawyers, and such other compensatory damages in an amount to be proven at trial.

88.     The conduct and the illegal actions of the Defendants Ramos, Mandel, Cope, Randles, Schreiber, Schons, and Brown was willful, wanton, malicious, retaliatory, and done with the reckless disregard of the Constitutional rights of Plaintiff Mr. Kirk and does therefore justify the imposition of exemplary and

punitive damages as to each of them.

## THIRD CLAIM

## FABRICATION OF EVIDENCE---42 U.S.C. 1983

89.     Plaintiff Mr. Kirk re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 88, inclusive, in this Complaint as though fully set forth herein.

90.     As alleged above, the Defendants Randles and Schreiber fabricated evidence that was used to obtain an Indictment against Plaintiff Mr. Kirk for multiple serious felony charges.  The fabricated evidence included, but is not limited to, the false statements and testimony of Mr. Bill Postmus, the Defendant Aleman, the Defendant Gonzales, and the Defendant Randles.

91.     The Defendants Randles and Schreiber continued the criminal investigation of Plaintiff Mr. Kirk even though knowing that Plaintiff Mr. Kirk was innocent of all of the alleged criminal activity, and the Defendants Randles and Schreiber were intentionally indifferent to the innocence of Plaintiff Mr. Kirk.

92.     The Defendants Randles and Schreiber used tactics that were coercive and abusive such that they knew, or were intentionally indifferent to, the fact that such tactics would produce false and inherently unreliable information and evidence, and that such information and evidence was used to get an Indictment of multiple serious felony charges against Plaintiff Mr. Kirk.

93.     The harm to Plaintiff Mr. Kirk from the illegal actions of the Defendants Randles and Schreiber has resulted in the loss of income, the loss of retirement benefits, the loss of employment with the County of San Bernardino, the loss of business opportunities, the loss of reputation, the cost of hiring lawyers, and such other compensatory damages in an amount to be proven at trial.

94.     The illegal actions and the conduct of Defendants Randles and Schreiber was willful, wanton, malicious, retaliatory, and with reckless disregard for the Constitutional rights of the Plaintiff, Mr. Kirk and does therefore justify the

imposition of exemplary and punitive damages as to each of them.

## FOURTH CLAIM

## MONELL CLAIM---42 U.S.C. 1983

## THE DEFENDANT COUNTY

95.     Plaintiff Mr. Kirk re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 94, inclusive, in this Complaint as though fully set forth herein.

96.     The Plaintiff Mr. Kirk lawfully exercised his right to free speech and his rights to freedom of association, and other rights, under the United States Constitution at all relevant times herein.  The individual Defendants, acting under the color of state law, then retaliated against the Plaintiff Mr. Kirk as alleged herein for what the Defendants knew was Plaintiff Mr. Kirk's lawful exercise of his rights under the United States Constitution.

97.     The Defendant County had in place official, and widespread, and longstanding practices and procedures that amounted to the deliberate and intentional indifference to Plaintiff Mr. Kirk's right to exercise his rights under the United States Constitution without the retaliation of the government.

98.     The practices and the procedures and the policies of the Defendant County were a motivating and moving force behind the retaliatory actions and conduct as alleged herein. The Defendant County permitted, maintained, and allowed, but is not limited to, the following:

A.  Permitting, ratifying, and condoning, the District Attorney's Office for the County of San Bernardino to engage its resources and its investigators in politically-charged criminal investigations without the regard for the existence of credible and reliable evidence;

B.  Permitting, ratifying, and condoning, the Defendant County's employees in the District Attorney's Office to prepare and execute falsified search warrants and engage in un-warranted criminal investigations in a manner intended to

embarrass, punish, and harass resulting in retaliation;

C.  Permitting, ratifying, and condoning, the District Attorney's Office to target the free speech that is protected by the United States Constitution through the un-warranted criminal investigations for the purpose of chilling such protected free speech;

D.  Permitting, ratifying, and condoning, the Public Integrity Unit of the District Attorney's Office to employ investigators who are dedicated to working on the Public Integrity Unit's investigations, and therefore removing upon said investigators the important and necessary checks-and-balances between the investigators and the prosecutors;

E.  Permitting, ratifying, and condoning, the collusive action between the District Attorney's Office and other County employees for the purpose of engaging in un-warranted criminal investigations in such a way as to intentionally embarrass, punish, and harass as retaliation.

99.   The Defendant Ramos who at all times relevant herein was an official with final policymaking authority as it relates to the District Attorney's Office and the criminal investigations that are undertaken and maintained by the District Attorney's Office.  Therefore, the actions and the conduct of the Defendant Ramos as alleged herein and his authority and supervision of the Public Integrity Unit of the District Attorney's Office, and his willful, affirmative, and conscious approval and ratification of the illegal, wrongful, and retaliatory criminal investigation of the Plaintiff Mr. Kirk constitutes an act of official government policy.

100.   As a legal and proximate result of the County's practices and procedures and policies, as alleged herein, and the Defendant Ramos's actions and conduct as an official with policymaking authority, the Defendant County violated the right of the Plaintiff Mr. Kirk to the free exercise of his rights under the United States Constitution without the retaliation of the government which has resulted in the Plaintiff Mr. Kirk suffering harm and injury, including the loss of income, the

loss of retirement benefits, the loss of employment with the County of San Bernardino, the loss of business opportunities, the loss of reputation, the cost of hiring lawyers, and such other compensatory damages in an amount to be proven at trial.

101.   The Defendant County's actions and conduct was willful, wanton, malicious, and was done with the reckless disregard for the Constitutional rights of Plaintiff Mr. Kirk and does therefore justify the imposition of exemplary and punitive damages.

## FIFTH CLAIM

## SUPERVISORIAL LIABILITY---42 U.S.C. 1983

## DEFENDANTS RAMOS, MANDEL, COPE, SCHONS, AND BROWN

102.   Plaintiff Mr. Kirk re-alleges and incorporates by reference herein each allegation contained in paragraphs 1 through 101, inclusive, in this Complaint as though fully set forth herein.

103.   On the basis of information and belief, and on the basis of the fact that Defendant Ramos was the District Attorney for the County of San Bernardino at all times relevant herein, the Defendant Ramos supervised Defendants Cope, Randles, and Schreiber regarding their actions and their conduct as alleged herein.  As the District Attorney for the County of San Bernardino, and as their supervisor, the Defendant Ramos knew or should have known of their malicious and illegal retaliatory actions and conduct and the Defendant Ramos did not take steps to prevent and to stop said action and conduct.  The failure by the Defendant Ramos to take the steps to prevent and to stop the malicious and the illegal retaliatory actions and conduct of the Defendants Randles and Schreiber resulted in the deprivation of, and the interference with, the lawful exercise of the rights of the Plaintiff Mr. Kirk under the United States Constitution.  And the Defendant Ramos's supervision, control, and training of the Defendants Cope, Randles, and Schreiber was a legal and proximate cause of their illegal retaliatory actions and conduct and constituted the

deliberate and intentional indifference to the deprivation of the rights of Plaintiff Mr. Kirk under the United States Constitution.

104.   On the basis of information and belief, the Defendant Cope supervised the Defendants Randles and Schrieber with regard to their actions and conduct as alleged herein.  In this capacity, the Defendant Cope knew or should have known of their illegal and retaliatory actions and conduct and the Defendant Cope failed to take the action necessary to prevent and to stop that actions and conduct and/or the Defendant Cope acquiesced in the deprivation of the Plaintiff Mr. Kirk's rights under the United States Constitution.  The Defendant Cope's supervision, control, and training of the Defendant's Randles and Schreiber was a legal and proximate cause of their illegal and retaliatory actions and conduct and constituted deliberate indifference to the rights of the Plaintiff Mr. Kirk under the United States Constitution.

105.   On the basis of information and belief, the Defendant Brown supervised the Defendant's Mandel and Schons with regard to their actions and conduct as alleged herein.  In this capacity, the Defendant Brown knew or should have known of their illegal retaliatory actions and conduct, and the Defendant Brown failed to take action to prevent and to stop that conduct and/or acquiesced in the deprivation of the rights of Plaintiff Mr. Kirk under the United States Constitution.  The Defendant Brown's supervision, control, and training of the Defendants Mandel and Schons was a legal and proximate cause of their illegal actions and conduct and/or constituted deliberate indifference to the deprivation of the rights of the Plaintiff Mr. Kirk under the United States Constitution.

106.   On the basis of information and belief, the Defendant Mandel supervised the Defendants Randles and Schreiber with regard to their illegal actions and conduct as alleged herein.  In this capacity, the Defendant Mandel knew or should have known of their illegal retaliatory actions and conduct, and the Defendant Mandel failed to take action to prevent and to stop that conduct and/or

acquiesced in the deprivation of the rights of Plaintiff Mr. Kirk under the United States Constitution. The Defendant Mandel's supervision, control, and training of the Defendants Randles and Schreiber was a legal and  proximate cause of their illegal and retaliatory actions and conduct and/or constituted deliberate indifference to the deprivation of the rights of Plaintiff Mr. Kirk under the United States Constitution.

107.   On the basis of information and belief, the Defendant Schons supervised the Defendant Randles and Schreiber with regard to their actions and conduct as alleged herein.  In this capacity, the Defendant Schons knew or should have known of their illegal and retaliatory actions and conduct, yet he failed to take the action to prevent and to stop that action and conduct and/or acquiesced in the deprivation of the rights of Plaintiff Mr. Kirk under the United States Constitution. The Defendant Schons supervision, control, and training of the Defendants Randles and Schreiber was a legal and proximate cause of their illegal and retaliatory actions and conduct and/or constituted deliberate indifference to the deprivation of the rights of Plaintiff Mr. Kirk under the United States Constitution.

108.   The Defendant's supervisorial conduct as alleged herein was so closely related and connected to the deprivation of the rights of the Plaintiff Mr. Kirk under the United States Constitution as to be the moving force that caused the resulting injuries to the Plaintiff Mr. Kirk.  Each of the Defendants was acting under the color of the state law.

109.   As a legal and proximate result of the Defendants Ramos, Mandel, Cope, Schons, and Brown's supervisorial actions and conduct, the right of the Plaintiff Mr. Kirk to freely exercise his rights under the United States Constitution without government retaliation was violated and resulted in the Plaintiff Mr. Kirk to suffer injury and harm, including the loss of income, the loss of retirement benefits, the loss of employment with the County of San Bernardino, the loss of business opportunities, the loss of reputation, the cost of hiring lawyers, and such other

compensatory damages in an amount to be proven at trial.

110.   The actions and the conduct of the Defendants Ramos, Mandel, Cope, Schons, and Brown, in their supervisorial capacity was willful, wanton, malicious, and was done with reckless disregard for the rights of Plaintiff Mr. Kirk under the United States Constitution, and does therefore justify the imposition of exemplary and punitive damages.

SIXTH CLAIM

CONSPIRACY---42 U.S.C. 1983

ALL DEFENDANTS

111.   The Plaintiff, Mr. Kirk, re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 110, inclusive, in this Complaint as though fully set forth herein.

112.   The Defendants formed a combination of two or more persons acting in concert to commit the individual acts described in this Complaint herein, the primary and principal element and objective was the agreement amongst the Defendants to maliciously and illegally retaliate against the Plaintiff, Mr. Kirk and to deprive him of his right to free speech, and his rights of freedom of association, and his other rights, such as his right to Due Process in the Fifth and Fourteenth Amendments, and his right to the Equal Protection of the law under the Fourteenth Amendment under the United States Constitution.

113.   The Defendants conspired, combined, colluded, and/or agreed to act in concert to wrongfully initiate and pursue the criminal investigation of the Plaintiff Mr. Kirk, and to obtain an Indictment against the Plaintiff Mr. Kirk, and to prosecute him for multiple serious felony crimes in a lengthy criminal jury trial because the Plaintiff Mr. Kirk, lawfully exercised his rights under the United States Constitution to serve as the Executive Director and the Founder of the AEG, and to lawfully and properly accept a political contribution from Colonies to the AEG.

114.   The Defendants performed overt acts in furtherance of the conspiracy

31

COMPLAINT

as alleged herein.

115.   The Defendant's conspiracy was the proximate cause of the illegal retaliation against Plaintiff Mr. Kirk and the deprivation of Plaintiff Mr. Kirk's rights under the United States Constitution.

116.   As a direct result of the Defendant's conspiracy, the Plaintiff Mr. Kirk has suffered injury and harm, including the loss of income, the loss of retirement benefits, the loss of employment with the County of San Bernardino, the loss of business opportunities, the loss of reputation, the cost of hiring lawyers, and other such compensatory damages in an amount to proven at trial.

117.   The actions and the conduct of the Defendant's was willful, wanton, malicious, and was done with the reckless disregard for the right of the Plaintiff Mr. Kirk to freely exercise his rights under the United States Constitution, and has resulted in the deprivation of the rights of the Plaintiff Mr. Kirk under the United States Constitution and therefore does justify the imposition of exemplary and punitive damages as to each of them.

## SEVENTH CLAIM

## RETALIATION IN EMPLOYMENT---STATE LAW

118.   The Plaintiff Mr. Kirk re-alleges and incorporates by reference each allegation contained in paragraphs 1 through 117, inclusive, in this Complaint as though fully set forth herein.

119.   The Plaintiff Mr. Kirk was working as the Director of Government Relations for the County of San Bernardino in the County's Executive Office at the time that the Indictment was handed down by the criminal Grand Jury in May of 2011, and at the time that he was arrested on the charges contained in the Indictment.  At this time, the Plaintiff Mr. Kirk was placed on administrative leave *without pay*.  The Plaintiff Mr. Kirk was told by the Chief Executive Officer for the County of San Bernardino, Mr. Greg Devereaux, that there was no way for the County to work out any kind of possible arrangements with the Plaintiff Mr. Kirk to

1   receive any salary or financial compensation of any kind.

2        120.   The Plaintiff Mr. Kirk went to the County Administration Building to

3   his office on the Fifth Floor to collect his things from his office.  The Plaintiff Mr.

4   Kirk was told by Andrew Lamberto that Supervisor Josie Gonzales had screamed at

5   him for allowing the Plaintiff Mr. Kirk onto the Fifth Floor of the County

6   Administration Building, and that the Plaintiff Mr. Kirk was not to ever be allowed

7   onto the Fifth Floor, nor was the Plaintiff Mr. Kirk to be allowed to communicate

8   with his co-workers and staff.

9        121.   Mr. Andrew Lamberto told the Plaintiff Mr. Kirk that Supervisor

10  Gonzales had called him a *criminal* to Mr. Lamberto.

11       122.   At this point in time The Plaintiff Mr. Kirk believed that he had no

12  viable options in terms of keeping his job, or in terms of receiving some kind of

13  financial compensation from the County during the time that the criminal litigation

14  was ongoing. The Plaintiff Mr. Kirk resigned his at will position as the Director of

15  Government Relations for the County.

16       123.   The retaliatory actions and conduct by the Defendant Josie Gonzales,

17  and the Defendant County resulted in the loss of income, the loss of retirement

18  benefits, the loss of reputation, the loss of health benefits, and such other

19  compensatory damages in an amount to be proven at trial.

20                          **PRAYER FOR RELIEF**

21       WHEREFORE, PLAINTIFF, MARK A. KIRK, demands judgement against

22  Defendants for the following relief

23       1.   Damages of no less than $40-million dollars, but in an amount

24  ultimately to be proven at trial, including but not limited to:

25            a.    Compensatory damages for injury to person, lost income, lost

26  retirement benefits, loss of reputation, loss of other employment benefits, and loss of

27  business opportunities;

28            b.    Punitive damages.

COMPLAINT

2.      An award of reasonable attorney's fees, costs, and expenses to Plaintiff, Mark A. Kirk, pursuant to 42 U.S.C. 1988, in an amount to be proven at trial;

3.      For costs of suit herein incurred;

4.      Pre-judgment interest;

5.      For such other and further relief as this Court shall find just and proper.

Dated:  July 30, 2018

/s/ Peter Scalisi

Peter Scalisi
Attorney for Plaintiff MARK A. KIRK

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rules of Civil Procedure 38(b), Plaintiff Mark Kirk hereby demands a trial by jury of all issues so triable.

Dated:  July 30, 2018

/s/ Peter Scalisi

Peter Scalisi
Attorney for Plaintiff MARK A. KIRK